AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
AUG 30 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                            DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  **19MJ3698**
Blue Verizon Kyocera, )
IMEI: 015247001598226 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Transportation of Certain Aliens for Financial Gain and Aiding and Abetting |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher R. Caudillo, Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/29/2019

_____
*Judge's signature*

City and state: San Diego, CA                 Hon. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii), (v)(II), and (a)(1)(B)(i), Transportation of Certain Aliens for Financial Gain and Aiding and Abetting, is:

Blue Verizon Kyocera,
IMEI: 015247001598226
(**"Target Device 2"**).

**Target Device 2** is currently in the possession of the United States Border Patrol as evidence and being held at USBP custody at 3752 Beyer Boulevard, San Diego, CA 92154.

## **ATTACHMENT B**

Authorization to search Target Device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below. The seizure and search of the Target Device shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 18, 2019 up to and including April 18, 2019:

a. tending to identify attempts to smuggle aliens from Mexico into the United States and within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii), (v)(II), and (a)(1)(B)(i), Transportation of Certain Aliens for Financial Gain and Aiding and Abetting.

# AFFIDAVIT IN SUPPORT OF AN
# APPLICATION FOR SEARCH WARRANT

I, Christopher R. Caudillo, Agent with the United States Border Patrol, being duly sworn, declare and state:

## INTRODUCTION

1. This affidavit is made in support of applications for warrants to search the following electronic devices, as further described in Attachments A-1, A-2, and A-3 (collectively the **Target Devices**), and seize evidence of crimes, specifically violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii), (v)(II), and (a)(1)(B)(i), Transportation of Certain Aliens for Financial Gain and Aiding and Abetting (Felony) (the "Target Offenses"), more particularly described in Attachment B:

   a. Motorola Smartphone
      IMEI: 354138096835053
      **(Target Device 1)**

   a. Blue Verizon Kyocera
      IMEI: 015247001598226
      **(Target Device 2)**

   b. Blue Alcatel Smartphone
      IMEI: 015249000955156
      **(Target Device 3)**

This search supports an investigation and prosecution of HEATHER MILLER for the Target Offenses. A factual explanation supporting probable cause follows.

2. As discussed in more detail below, MILLER was arrested on April 17, 2019, at the Border Patrol checkpoint on Interstate 8 in San Diego County with two illegal aliens hidden in the trunk of the vehicle that she was driving. **Target Device 1** was seized at the time of Defendant's arrest, and MILLER claimed ownership of this

phone during a post-arrest property inventory.[1] **Target Device 2** and **Target Device 3** were recovered from the center console area in the vehicle driven by MILLER on the day of her arrest. The **Target Devices** are currently in the possession of United States Border Patrol ("USBP") as evidence and being held in USBP custody at 3752 Beyer Boulevard, San Diego, CA 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target Devices** will produce evidence of one or more of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant.

**EXPERIENCE AND TRAINING**

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

---

[1] I am uncertain as to whether **Target Device 1** was recovered from MILLER's person. However, as noted, she later claimed ownership of this device.

Page 2 of 12

6. I am a U.S. Border Patrol Agent, and have been so employed since February, 2011. I am a graduate of the United States Border Patrol Academy at the Federal Law Enforcement Training Center (FLETC) in Artesia, New Mexico. I have received specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, and in Title 19, United States Code, Customs law violations. I have been trained in investigating various violations of Federal Law, including alien smuggling, narcotics smuggling, and bulk currency smuggling. I have worked with other Agents with extensive experience in these investigations as well.

7. I am presently assigned to the Campo Station Abatement Team (CSAT). CSAT is tasked with the responsibility of identifying and arresting alien smugglers in the Campo Stations area of operations within the San Diego Sector of the United States Border Patrol. CSAT Agents deploy in plain clothes attire and operate unmarked Border Patrol vehicles.

8. During the course of my employment with U.S. Border Patrol and with CSAT, I have participated in investigations which have resulted in the issuance of arrest warrants, search warrants, seizures, and the indictments of persons for alien and narcotics smuggling to include load drivers, foot guides, and load house operators. I have investigated and prepared cases for prosecution against persons involved in the inducement of illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; the transportation and harboring of undocumented aliens within the United States; and the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by undocumented aliens to illegally gain entry or remain in the United States. I have also participated in alien smuggling, narcotics smuggling, and bulk cash smuggling investigations which have resulted in both federal and state criminal charges.

9. Through my training and experience, I have gained a working knowledge and insight into the typical workings of criminal organizations. I have also gained extensive

information as to the operational habits of alien and narcotics smugglers. Through my training and experience I have gained a working knowledge and insight into the typical workings of alien smuggling organizations. I have also gained extensive information as to the operational habits of persons who are involved in alien smuggling. Through my training and experience and my conversations with other experienced criminal investigators, I have become familiar with the behavior, speech, routes and method of operations of criminal organizations to avoid detection and apprehension by law enforcement officers. I am aware that it is a common practice for alien smugglers to use cellular telephones and portable radios to maintain communications with co-conspirators and collect smuggling fees to further their criminal activities. I am also aware that smugglers often use cameras, to include cameras built into their cellular phone, to gather intelligence on law enforcement operations, including checkpoint operations, Agent deployment and placement, Agent patrols, and Agent techniques, in order to identify vulnerabilities to aid their smuggling activities. I am also aware that alien smugglers use cameras to identify reference points and landmarks to aid them in navigating smuggling routes and directing drivers.

10. Based upon my training and experience as a Border Patrol Agent, consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Alien smugglers will use cellular telephones and smart devices with messaging applications because they are mobile and they have instant access to telephone calls, social media application, and text and voice messages;

    b. Alien smugglers will use cellular telephones and smart devices because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

    c. Alien smugglers and their accomplices will use cellular telephones and smart devices because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d. Alien smugglers will use cellular telephones and smart devices to direct the alien smuggler drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Alien smugglers will use cellular telephones and smart devices to notify or warn their accomplices of law enforcement activity, and in particular USBP enforcement activity, to include the presence and posture of marked and unmarked units, as well as the operational status of USBP checkpoints;

f. Alien smugglers will often use cellular phones and smart devices to remotely guide illegal aliens who are crossing into the United States, providing them instructions as to where to go and what to do during a smuggling event. This is often done from over watch positions on high ground in Mexico or at the border fence. This allows smugglers to remotely control the actions of the smuggled aliens, while insulating themselves from criminal prosecution, which an alien smuggling foot guide who was physically present in the company of the aliens would be exposed to.

g. Conspiracies involving alien smuggling often generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators.

11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my training and experience as a USBP agent, consultations with law enforcement officers experienced in smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.

This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training and education, I have learned that searches of cellular/mobile telephones associated with smuggling investigations yield evidence:

    a. tending to identify attempts to smuggle aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

13. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate alien smuggling activity, I know the following:

    a. Alien smuggling conspiracies often require detailed and intricate planning to successfully evade detection by law enforcement;

    b. This often requires coordination and planning in the days and even weeks prior to the day of the smuggling event;

    c. In prior smuggling events that I have investigated, as well as based on conversations with other Border Patrol Agents, I have found that alien smuggling organizations sometimes organize their load drivers two to three months in advance, keeping a roster of load drivers that are

available. In my experience, it is not uncommon for alien smuggling organizations to call upon a load driver multiple times, especially if there is an unsuccessful prior smuggling attempt and the organization waits several weeks before attempting another smuggling event; and

d. Co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject via mobile telephone after his/her arrest to determine the whereabouts of their cargo.

## FACTS SUPPORTING PROBABLE CAUSE

14. On April 17, 2019, I and other USBP agents were performing their assigned duties in the Campo Border Patrol Station's Area of Responsibility. This Area of Responsibility encompasses anything north of the international boundary from Forrest Gate Road to the west and Jewel Valley Road to the east. Based on my training and experience, I know that illegal aliens are commonly picked up by alien smugglers in this area due to the presence of paved or maintained roads leading directly to interstates and highways from the immediate border area.

15. At approximately 12:47 p.m., I observed a dark gray Hyundai four-door vehicle ("the Vehicle") traveling eastbound on Old Highway 80 towards Jacumba, California. I was only able to see a female driver in the car and requested records checks on the license plate of the Vehicle. I was advised that those checks revealed that the Vehicle was registered out of Santa Ana, California with only one Border Patrol Checkpoint crossing through the Interstate 8 checkpoint the day prior, April 16, 2019. Significantly, I am aware that the checkpoint was down due to inclement weather during that previous passing.

16. At approximately 1:27 p.m. the same day, I noticed the Vehicle traveling back westbound on Old Highway 80. I noticed that the Vehicle appeared to be a lot lower in the rear than it did when I initially saw the Vehicle. In my training and experience, vehicles riding that low are often overloaded with people. However, I could only see one occupant: the female driver. I then followed the Vehicle onto westbound Interstate 8 towards the Border Patrol Checkpoint.

17. At approximately 1:44 p.m., I notified the checkpoint agents that the Vehicle was entering the cone pattern and was in lane number one.

18. According to a report written by BPA Craig Golden, he was working primary inspection at the checkpoint and spoke to the driver, later identified as MILLER. BPA Golden questioned MILLER as to her country of citizenship and MILLER replied that she was a United States citizen. BPA Golden noticed that MILLER kept moving her eyes back and forth in a flustered manner. As BPA Golden was speaking to MILLER, another agent notified him that his canine partner had alerted to the Vehicle and asked BPA Golden to refer MILLER to secondary inspection.

19. Once in secondary inspection, I approached MILLER and asked her to exit the Vehicle. I informed MILLER that the canine agent received an alert from his canine partner and asked MILLER if she had anything illegal in the Vehicle. MILLER replied, "No." I then began searching the Vehicle and found two individuals sweating profusely hiding in the trunk. I introduced myself and performed an immigration inspection. The two individuals in the trunk told me that they were illegally present in the United States.

20. At approximately 1:50 p.m., I placed all three individuals under arrest. I am informed that **Target Device 1** was recovered during arrest processing of MILLER. When I later showed MILLER **Target Device 1**, she identified it as belonging to her.[2] According to BPA Golden, at the time of her arrest, MILLER provided a false name of "Crystal Ann Hedges" and a false birth date. Finally, I am informed that **Target Device 2** and **Target Device 3** were recovered from the Vehicle; I had previously observed them in the center console area.

21. According to reports by BPA Canel and BPA Bak-Sklener, the two individuals in the trunk were identified as Martin Havana-Gonzalez and Joaquin Rivera-

---

[2] As previously discussed, it is unclear where precisely **Target Device 1** was found during arrest processing. However, as stated, MILLER later identified **Target Device 1** as belonging to her.

Page **8** of **12**

Santiago (collectively the "Material Witnesses"). Both provided post-arrest statements as follows:

    a.    Havana-Gonzalez stated that he was a Mexican citizen, possessed no immigration documents, and his uncle had arranged for his crossing into the United States with a smuggling fee of $8,000. After he climbed over the border fence, a masked man told him and two other individuals to walk for about 30 to 40 minutes until they arrived at a highway where a green car would be waiting for them to give them a ride. Havana stated that he knew when the car arrived because he saw the trunk open, at which point he and another individual climbed into the trunk and closed it.

    b.    Rivera-Santiago stated that he was a Mexican citizen, possessed no immigration documents, and made arrangements to be smuggled into the United States for a smuggling fee of $8,000. He stated that his family was going to pay the fee after he crossed into the United States and arrived in Los Angeles, California.

22. Given the facts surrounding MILLER's arrest, and based on my training and experience investigating alien smugglers, as well as consultation with other law enforcement officers experienced in alien smuggling investigations, I submit that this probable cause to believe that information relevant to the smuggling activities of MILLER will be found on the **Target Devices**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data, is evidence:

    a.    tending to identify attempts to smuggle aliens from Mexico into the United States and within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

  d. tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

23. Based on my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I further believe that information relevant to the alien smuggling activities and her co-conspirators, such as recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the **Target Devices** and may identify other persons involved in alien smuggling activities. For the reasons set forth above, I request permission to search the **Target Devices** for items listed in Attachment B for the time period from January 18, 2019 up to and including April 18, 2019, which was the day following MILLER's arrest.

## SEARCH METHODOLOGY

24. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data

contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## CONCLUSION

27. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that MILLER utilized the **Target Devices** to facilitate the smuggling of unlawful aliens in violation of Title 8, United States Code, Section 1324.

28. Because the **Target Devices** were promptly seized during the investigation of MILLER's smuggling activities and securely stored, there is probable cause to believe that

evidence of illegal activities committed by MILLER continues to exist on the **Target Devices**. As stated above, the appropriate date range for this search is from January 18, 2019 through April 18, 2018.

29. Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1, A-2, and A-3, and seize the items listed in Attachment B, using the methodology described above.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Christopher R. Caudillo
U.S. BORDER PATROL AGENT

SUBSCRIBED AND SWORN TO BEFORE ME THIS 29th DAY OF AUGUST.

_____
HON. ANDREW G. SCHOPLER
UNITED STATES MAGISTRATE JUDGE